IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SANDRA G. SEYMOUR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 13-cv-286-JPG-CJP** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to 28 U.S.C. § 636(b)(1)(B).

In accordance with 42 U.S.C. § 405(g), plaintiff Sandra G. Seymour seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in August, 2009, alleging disability beginning on August 1, 2007. (Tr. 18). After holding an evidentiary hearing, ALJ Joseph W. Warzycki denied the application for benefits in a decision dated September 20, 2011. (Tr. 18-32). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.   The ALJ erred in not giving greater weight to the opinions of plaintiff's treating doctors and in failing to include all limitations supported by the evidence in his assessment of her residual functional capacity.

2.   The ALJ failed to properly evaluate plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Ms. Seymour was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

4

the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above. He determined that Ms. Seymour had not been engaged in substantial gainful activity since the date of her application.  He found that plaintiff had severe impairments of cervical degenerative disc disease, depression, anxiety, history of marijuana use and a history of alcohol use.  He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Seymour had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with some limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation.   The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in 1962, and was 45 years old on the alleged onset date of

August 1, 2007.   She was insured for DIB through June 30, 2010.   (Tr. 228).[2]

Plaintiff said she stopped working on August 1, 2007, because she could no longer perform the functions of her job.   She was unable to work because of back and neck injuries, anxiety and depression.   (Tr. 213).   Her most recent employment was as a restaurant manager.   She had also worked as a laborer for a commercial carpet company.   (Tr. 214).

In September, 2009, plaintiff filed an Activities of Daily Living report in which she said she lived with her 13 year old son.   She said she could not sit or stand for very long.   She did very little housework.   Her son did the vacuuming and took care of himself.   She had difficulty concentrating and had racing thoughts.   She was unable to handle stress.   She said that just filling out the form caused her burning pain in her neck, pain in her tailbone, headache and pain in her shoulders. (Tr. 243-256).


After the initial denial of her claim, she submitted a report stating that she had gotten worse, and had been diagnosed with bipolar disease and severe loss of memory.   She was sometimes unable to leave her house because of anxiety.   (Tr. 274, 277).

**2.     Evidentiary Hearing**

Ms. Seymour was represented by an attorney at the evidentiary hearing on August 30, 2011.   (Tr. 40).

Plaintiff was 49 years old at the time of the hearing.   She was 5' 1" tall and

---

[2] The date last insured is relevant to the claim for DIB only.

weighed 132 pounds.   (Tr. 43).   She was living with her two sons, aged 30 and 15.

(Tr. 44).

She last worked in August, 2007.   She was training to be a manager at a
Burger King restaurant.   She worked there for less than 30 days.   "The stress was
too much."   (Tr. 47-48).   She later tried to return to Burger King, but "got into it"
with another employee and lost her job.   (Tr. 50).   Before that, she worked for 3
years as a "ripper" for a commercial carpet company.   This involved moving
furniture, removing old carpet, and bringing in new carpet squares to be installed.
(Tr. 48).

Ms. Seymour said she did not do much on a daily basis.   She drove her
younger son to school, and did maybe one load of laundry a day.   She only did
simple cooking in the microwave.   She was unable to carry bags of groceries.   She
spent her time watching TV, laying down or sleeping.   (Tr. 51-54).   She was
unable to stand long enough to take a shower.   (Tr. 57).   She drank alcohol
occasionally and last used marijuana in the 1970's.   (Tr. 57).   She testified that a
recent doctor's note stating that she used marijuana 4 to 6 months earlier was
incorrect and the doctor misunderstood her.   (Tr. 71).

She took a number of medications for depression, anxiety and pain.   She
had no side effects.   (Tr. 58-60).

She had neck pain and headaches.   She hurt her neck in 3 car accidents.
The most recent accidents were in April and May of 2011.   Her headaches
increased after the third accident.   She had been given a neck brace, but was not
wearing it at the hearing.   She also had pain in her low back which she attributed

to the administration of an epidural when she had her son 15 years earlier.   (Tr. 60-63).   She also had depression, anxiety and crying spells.   (Tr. 64-66).

Dr. Robert Thompson testified as an independent medical expert regarding plaintiff's physical impairments.   He had not examined plaintiff.   His testimony was based on a review of her medical records and her testimony at the hearing. (Tr. 71-72).   Dr. Thompson testified that her impairments did not meet or equal a listed impairment.   He also testified that she would be limited to a total of 3 to 4 hours of standing/walking a day, would need to take a break every 20 to 30 minutes, and could not sustain a full 8 hour workday.   (Tr. 73-76).

Dr. James Reed testified as an independent medical expert regarding plaintiff's mental impairments.   He had not examined plaintiff, but had reviewed records and heard her testimony.   (Tr. 76-77).   Dr. Reed noted that Dr. Baig's March 3, 2011, office note stated that she had been having problems with alcohol and marijuana 6 months earlier.   According to Dr. Reed, this was "significant" and "may very explain a great deal of her emotional state."   (Tr. 78-79).   He testified that her mental impairments did not meet or equal a listed impairment based on the objective data.   (Tr. 81).   Based upon her testimony at the hearing, he would characterize her as being moderately impaired in concentration, persistence and pace.   (Tr. 82).

Lastly, a vocational expert (VE) testified.   The ALJ asked him to assume a person of plaintiff's age and work experience who could do work at the sedentary exertional level, limited to standing/walking for a total of 2 hours a day with a sit/stand option.   She was limited to occasional postural activities except no

climbing of ladders, ropes or scaffolds, and was limited to only occasional overhead reaching.   She was further limited to simple routine tasks and instructions, with only occasional interaction with supervisors, coworkers and the public.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are document preparer and administrative support worker.   (Tr. 86-88).   If she were limited to only occasional handling and fine manipulation, she would be unable to do any jobs available in the national economy.   (Tr. 88).

### 3.   Medical Treatment

Ms. Seymour's primary care physician was Dr. Kevin Boyd.   She first saw him in November, 2006, for complaints of depression and anxiety.   Dr. Boyd noted that she was "a homemaker."   She had no complaints of neck pain, back pain or headaches.   Dr. Boyd diagnosed "questionable anxiety," and prescribed Effexor. (Tr. 345).   Her medication was changed to Klonopin in March, 2007.   (Tr. 344). In April, 2007, she reported that the Klonopin was "working great for her."   (Tr. 343).   She was depressed due to financial problems in May, 2007, so Dr. Boyd prescribed Prozac.   (Tr. 341).   At a follow-up appointment in June, 2007, she was "feeling much better."   Dr. Boyd described her as smiling, laughing and joking. She had lost about 10 pounds, but reported that she worked a lot in the yard and was "very active now that it is summertime."   (Tr. 340).

The alleged date of onset is August 1, 2007.   Ms. Seymour saw Dr. Boyd on August 15, 2007, and requested that her Klonopin be increased because she was getting ready to start a new job managing a Burger King.   Dr. Boyd refused to

increase the dosage of Klonopin, but did agree to increase the dosage of Prozac. (Tr. 340).   About a month later, Ms. Seymour told Dr. Boyd that she had quit her job "apparently because of some stress," and she wanted him to write a note so that she would not lose her public aid.   He agreed to write a note stating that she "was forced to lose her job because she was losing weight secondary to stress."   She had lost 4 pounds since the August visit.   (Tr. 339).   At the next visit, in October, 2007, Dr. Boyd noted that she had gained 4 pounds, but she had also discontinued Chantix, and he questioned whether her weight loss had been due to stress or to using Chantix.   She was not in "any distress whatsoever."   (Tr. 338).

In February, 2008, she was upset over a death in the family and her ex-husband being diagnosed with cancer.   Her Prozac was changed to Wellbutrin. (Tr. 336).   No further complaints of anxiety or depression are documented for the rest of 2008.   (Tr. 330-335).

Plaintiff first complained to Dr. Boyd about neck pain in March, 2009.   She said she had been chopping wood and raking leaves over the weekend, and had pain in her neck and burning in her legs.   (Tr. 329).   An x-ray showed mild degenerative disc disease in the cervical spine, greatest at C6-7.   There was no significant bony foraminal stenosis.   (Tr. 368).

Dr. Boyd prescribed physical therapy, which ended in May, 2009.   Plaintiff reported that she felt okay on most days.   (Tr. 328).   However, on May 21, 2009, she complained of increased pain, and Dr. Boyd ordered an MRI.   (Tr. 327).   In June, 2009, an MRI showed central disc bulges at C3-4 and C6-7.   Compared to a prior scan, the disc bulges showed no appreciable change.   (Tr. 367).   Dr. Boyd

referred her to pain management at St. Anthony's.   (Tr. 327).

In June and August, 2009, Dr. Boyd noted that Ms. Seymour refused to go to pain management.   He told her that he would not prescribe any narcotics for her until she tried pain management.   (Tr. 326).   On August 18, 2009, she was having problems with anxiety, irritability and crying.   She revealed that she had an affair with her sister's husband two years earlier, and "that hasn't been completely resolved."   He instructed her to try to find a psychiatrist who would take her medical card, and to talk to her sister.   (Tr. 325).   In September, 2009, plaintiff reported to Dr. Boyd that she had started counseling and had seen a psychiatrist and was "doing much better now."   She requested pain medication for her neck, and he again recommended that she see a pain management specialist.   (Tr. 325).

Ms. Seymour was first seen by Dr. Mirza Baig, a psychiatrist at Community Counseling Center, on October 22, 2009.   She had previously been seen by a counselor at that facility.   She told Dr. Baig that she had stopped working because of "severe arthritis."   She complained of depression and anxiety.   The Axis I diagnosis was rule out adjustment disorder with depressed mood.   Dr. Baig ordered blood work. (Tr. 457).   In November, 2009, Dr. Baig started her on Abilify.   (Tr. 456).   On December 15, 2009, she reported that her medicine was "making a big difference" and she was not depressed and was not having crying episodes any more.   (Tr. 454).

In January, 2010, Ms. Seymour told Dr. Baig that she was doing "pretty good."   She had no complaints and was not having any crying spells.   Her mental status exam was unremarkable.   Her mood was euthymic (i.e., normal), her affect

11

was appropriate, and she seemed "to be making good progress overall."   (Tr. 538).

In March, 2010, Dr. Baig again found that her mood was normal and her affect was

appropriate.   He noted that she had no mood swings and was "not clinically

depressed." (Tr. 537).   Thereafter, because she failed to keep appointments with

the counselor at Community Counseling Center, her case was terminated.   Dr.

Baig explained that she could reapply for care at that facility after two months.   He

noted that she was doing "reasonably well," except that she was upset that her case

was being closed.   (Tr. 559).

Ms. Seymour was last insured for DIB as of June 30, 2010.   (Tr. 20).

In October, 2010, Dr. Boyd saw plaintiff for her yearly physical.   He noted

that she was doing a lot better, and that Dr. Biggs [sic] "has got her pretty well

straightened out."   He wrote that she was "quite pleasant today and looking better

than I have seen her in quite some time."   He documented decreased range of

motion in the neck due to degenerative disc disease.   Motor strength was full and

equal, and she walked without difficulty.   (Tr. 599).   Later that month, Dr. Boyd

instructed his staff to have Ms. Seymour make an appointment for the purpose of

filling out disability forms.   (Tr. 600).

Plaintiff saw Dr. Boyd for a "disability evaluation" on November 11, 2010.

He noted that she had a past history of "extreme and disabling depression, chronic

neck and back pain."   On exam, she was "somewhat tremulous" and becoming

anxious.   She had "decreased range of mobility in almost all joints especially with

forward bending and movement of the neck and shoulders."   He noted that he

filled out the form "stating that she has severe anxiety and depression and is

12

probably fairly disabled because of that."   (Tr. 597).

In February, 2011, plaintiff complained to Dr. Boyd of neck and back pain. On exam, she had decreased range of motion of the neck, but no spinal or paraspinal tenderness.   She had pain getting on and off of the examining table. Dr. Boyd ordered a repeat MRI of the neck and x-rays of the lumbosacral spine. (Tr. 596).   She then missed several appointments with Dr. Boyd, but came in with sinus and chest congestion on March 6, 2011.   (Tr. 595-596).

After reestablishing care at Community Counseling Center, Ms. Seymour was seen by Dr. Baig on March 3, 2011.   She said that Abilify had been "helping me a lot" and she wanted to get back on it.   Dr. Baig wrote that Ms. Seymour stated:

> Last time when you asked me if I am going to test you I told you don't, because I was at that time had [sic] problems with alcohol and also marijuana and I know it would have been positive, but now it is almost six month since I had any of that stuff.   (Tr. 557).

Regarding her history of substance abuse, Dr. Baig noted that she began using drugs at age 15, and had last used 6 months earlier.   She started drinking alcohol at age 18, and had last used alcohol 6 months earlier.   On mental status exam, she was somewhat hypoactive, a little withdrawn, and somewhat tense and anxious. She said she felt depressed, but denied feelings of hopelessness or worthlessness. She had no suicidal thoughts and no psychotic symptoms.   Concentration and memory were fair.   Dr. Baig prescribed Abilify, ordered bloodwork, and directed her to return in 2 weeks.   The Axis I diagnosis was rule out major depressive disorder without psychotic features.   (Tr. 557-558).   No further office notes from Dr. Baig were submitted to the ALJ.

Plaintiff was evaluated by a pain management specialist in April, 2011, who recommended a right C5-6 transforaminal epidural steroid injection.   (Tr. 622-627).

On May 20, 2011, plaintiff reported to Dr. Boyd that she had been in 2 automobile accidents recently, and was having pain in the back of her neck radiating into her occipital region.   The diagnosis was cervical strain.   (Tr. 594). In June, 2011, she continued to complain of neck pain.   Dr. Boyd ordered an MRI and noted that "she is in a lot of pain that is somewhat out of proportion to her injuries on xray [sic]."   (Tr. 593).   On June 30, 2011, Dr. Boyd wrote that the MRI showed "mild 'pinched nerves' – lots of arthritis."   He ordered physical therapy. (Tr. 593).   No further office notes from Dr. Boyd were submitted to the ALJ.

In June, 2011, plaintiff's file at Community Counseling Center was again closed as she failed to keep her appointments.   (Tr. 554-555).

### 4.   Consultative Examinations

Raymond Leung, M.D., examined plaintiff on December 17, 2009.   He reviewed a cervical MRI film from June, 2009.   On exam, she had limited range of motion of the cervical spine.   The range of motion of the lumbar spine was full except for limitation in extension.   She had a full range of motion of her shoulders. Her gait was stiff.   She could walk 50 feet without a cane.   She could tandem walk and hop on her right leg.   She had difficulty hopping on her left leg.   She was able to heel walk, toe walk and squat.   Straight leg raising was limited to 20 degrees. She had no muscle atrophy or spasms.   Pinch, arm, leg and grip strength were 4+/5 throughout.   Sensation was normal.   (Tr. 497-503).

14

Stephen G. Vincent, Ph.D., performed a psychological examination on December 17, 2009.   Ms. Seymour told him that she had hand pain and decreased grip strength due to carpal tunnel syndrome.   She also complained of a stiff neck and radiating pain down her shoulders.   Her gait was unsteady.   She gave a history of anxiety and depression.   She reported that she had overwhelming anxiety attacks and bipolar illness.   On exam, she was fully oriented.   Her speech was slow and underproductive.   Her mood was moderately depressed, and she had anxiety at times.   The diagnoses were bipolar disorder, mixed type, currently in depressed phase, and panic disorder with agoraphobia.   (Tr. 490-495).

**5.    Opinions of Treating Doctors**

 In November, 2010, Dr. Boyd opined that Ms. Seymour could sit and stand/walk for less than 2 hours a day, and needed to alternate sitting and standing at will.   She would need to take 3 to 4 unscheduled breaks of 15 minutes each throughout the day.   She was limited to only occasional reaching in all directions. She could rarely twist, stoop/bend or crouch, but she could occasionally climb ladders and stairs.   Her pain was affected by depression and anxiety.   Dr. Boyd identified the medical/clinical findings which supported his opinions as "frequent depressive episodes" and "chronic back/neck pain."   He indicated that these limitations existed before June 30, 2010.   (Tr. 577-579).

Dr. Baig completed a form in which he assessed plaintiff's mental impairments in August, 2011.   He said he first saw her in March, 2011.   He said he did not know whether her impairments could be expected to last at least 12 months.   He completed another form in which he assessed her ability to do

15

work-related mental activities.   He indicated that she had only fair abilities in a number of areas, but also indicated that she had good ability to understand, remember and carry out simple job instructions.   (Tr. 616-620).

**6.     Records Not Before the ALJ**

The transcript contains medical records that were not before the ALJ.   As of the time the ALJ issued his decision, the medical records consisted of Exhibits 1F through 20F, i.e., Tr. 321 through 627.   See, List of Exhibits attached to ALJ's decision, Tr. 33-37.

Plaintiff submitted additional records to the Appeals Council, which considered them in connection with her request for review.   See, AC Exhibits List, Tr. 5.   Thus, the medical records at Tr. 628-640, designated by the Appeals Council as Exhibit 21F, were not before the ALJ.   These records mostly reflect treatment which occurred after the date of the ALJ's decision.

The medical records at Tr. 628-640 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error."  **Luna v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994).**   See also, **Getch v. Astrue, 539 F.3d 473, 484 (7th Cir. 2008);   Rice v. Barnhart, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).**

<u>**Analysis**</u>

Plaintiff first argues that the ALJ erred in assessing her RFC because he should have included additional limitations that are supported by her testimony

16

and by the opinions of her treating doctors. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)**. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." ***Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.** Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." ***Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." ***Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).**

It is true that the ALJ used the kind of boilerplate language that was criticized

in cases such as *Parker v. Astrue*, **597 F.3d 920 (7th Cir. 2010)**, and *Brindisi v. Barnhart*, **315 F.3d 783 (7th Cir. 2003)**.   However, the use of the boilerplate language does not necessarily require remand.   The use of the language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence.   See, *Shideler v. Astrue,* **688 F.3d 306, 310-311 (7th Cir 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).**

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, **556 F.3d 558, 562 (7th Cir. 2009).**   It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence.   *Ibid.*   See also, *Terry v. Astrue*, **580 F.3d 471, 478 (7th Cir., 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record.")   If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies.   *Zurawski v. Halter*, **245 F.3d 881, 887 (7th Cir. 2001).**

ALJ Warzycki gave specific reasons for his conclusion that plaintiff's allegations were not credible.   He pointed out that Ms. Seymour claimed to have been disabled due to neck and back pain, depression and anxiety since August 1, 2007, but she did not complain to her doctor of neck pain until March, 2009, and did not seek specialized psychiatric treatment until September, 2009.   Further, plaintiff had almost no earnings in the 3 and ½ years prior to the alleged date onset, suggesting that she was off work for reasons other than an alleged disabling condition.   She refused to go to pain management until Dr. Boyd withheld

narcotics from her.   Dr. Boyd described her pain complaints after her automobile accidents as inconsistent with the objective x-ray evidence.   The ALJ noted that plaintiff's testimony regarding her depression and anxiety was contradicted by Dr. Baig's office notes.   Further, plaintiff was twice discontinued from Dr. Baig's service because of failure to keep appointments.   The ALJ observed that plaintiff was able to maintain concentration and answer questions effectively and coherently throughout the 90 minute hearing.   (Tr. 27-28).

In addition, the ALJ noted that plaintiff's first complaint of neck pain came after she had been chopping wood and raking leaves over the weekend in March, 2009, well after the alleged onset of disability.   (Tr. 24).   He pointed out that she told Dr. Boyd that she had stopped working due to stress, but told Dr. Baig that she had stopped working due to arthritis and inability to sit for a long time.   (Tr. 25). Further, on December 15, 2009, she told Dr. Baig that she had significant improvement with medication, was not depressed and was not having crying spells. Only 2 days later, she told the examining psychologist that she had anxiety, depression and panic attacks.   (Tr. 26).

It is clear that the ALJ considered the relevant factors.   Plaintiff does not take issue with any of the reasons cited by the ALJ.   Rather, she argues generally that the ALJ should have more thoroughly analyzed plaintiff's credibility.   This is tantamount to no argument at all.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." ***Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).**   ALJ Warzycki's analysis is far from patently wrong.   It is evident that he

considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. ***Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).**

That leaves only plaintiff's argument about the weight given to the treating doctors' opinions. Plaintiff does not specify what weight she believes should have been given to these opinions; she simply argues that the ALJ did not give them sufficient weight.

The opinions of treating doctors are not necessarily entitled to controlling weight. Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added][3]

---

[3] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." ***Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).** If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. ***Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).** If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it. ***Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).** Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." ***Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.**

21

**2008).**

ALJ Warzycki gave minimal weight to the opinions of Drs. Boyd and Baig because they were inconsistent with the doctors' own treatment notes.   He pointed out that both doctors documented improvement that was not reflected in their opinions.   Notably, Dr. Baig said he began seeing plaintiff in March, 2011, ignoring his prior treatment notes which indicated that plaintiff had been doing very well. (Tr. 29).   The ALJ also pointed out that Dr. Boyd documented that plaintiff was doing well in October, 2010, in stark contrast to the opinion he expressed only one month later.   (Tr. 24).

Plaintiff makes only a vague argument that the ALJ did not sufficiently explain why he rejected the opinions Drs. Boyd and Baig.   Her argument consists mainly of highlighting the doctors' notations of plaintiff's complaints.   In light of the extensive discussion set forth in the ALJ's decision, this argument should be rejected.   The Court also notes that plaintiff's brief improperly asks the Court to consider the medical evidence that was not before the ALJ.

Plaintiff also suggests that the ALJ did not give sufficient reason for rejecting the opinion rendered by the medical expert at the hearing.   However, the ALJ clearly explained that this opinion was based on plaintiff's testimony and subjective complaints at the hearing, and was rejected on that basis.   See, Tr. 30.

In sum, plaintiff's arguments are, in effect, nothing more than an invitation for the Court to reweigh the evidence.   However, the reweighing of evidence goes far beyond the Court's role.   Even if reasonable minds could differ as to whether Ms.

Seymour is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. **Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012)**; **Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).**

## Recommendation

After careful review of the record as a whole, the Court is convinced that ALJ Warzycki committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the undersigned recommends that the final decision of the Commissioner of Social Security denying Sandra G. Seymour's application for disability benefits be **AFFIRMED** and that judgment be entered in favor of defendant.

Objections to this Report and Recommendation must be filed by **June 2, 2014.**

**Submitted:   May 15, 2014**.

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**